(*) FRANKLIN BANK *versus* STEWARD *&* *als.*

37  519
92  394

Of the powers and duties of agents.

Of the admissibility of declarations made by agents.

Of those declarations made by agents, which are to be viewed as parts of the *res gestæ*, and are admissible in evidence.

Of those declarations made by agents, which are not to be viewed as part of the *res gestæ*, and are not admissible as evidence.

Of the character and extent of the agency pertaining to the cashier of a bank.

It is not a part of the duty pertaining to the office of a cashier, to give to customers of the bank, information *as to transactions of the bank which have been fully transacted and past.*

Such information, if given by the cashier, will not bind the bank.

The declarations of the cashier, giving information as to a past transaction of the bank, though such transaction pertained to his own department of the business of the bank, are not receivable as evidence against the bank.— Per SHEPLEY, C. J., and TENNEY and HOWARD, J. J. — RICE and APPLETON, J. J., dissenting.

The surety on a note to the bank sent his agent after the pay-day, to inquire of the bank whether the note had been paid. To that inquiry the cashier, in the banking room, declared that the note had been paid. In a suit by the bank against the surety, — *Held*, that the declaration made by the cashier was inadmissible as evidence against the bank.

A surety on a note to the bank, having in his possession the property of the principal, with which he might have secured himself by attachment, sent his agent, after the pay-day, to inquire of the bank whether the note had been paid. To that inquiry the cashier, in the banking room, declared that it had been paid; whereupon the surety, relying upon that information, surrendered the property to the principal, who soon afterwards failed, became and has continued to be insolvent. In a suit by the bank against the surety, — *Held*, that the declaration made by the cashier was inadmissible as evidence against the bank. — Per SHEPLEY, C. J., and TENNEY and HOWARD, J. J. — RICE and APPLETON, J. J., dissenting.

ON REPORT from *Nisi Prius*, WELLS, J., presiding.

ASSUMPSIT on a note to the plaintiffs, dated Dec. 16, 1845, for $350, payable in ninety days from date, and signed by David C. Dinsmore as principal, and by Stephen Webber and James Steward as sureties. The general issue was pleaded and joined. The plaintiffs read in evidence the note declared on. The defence set up was that the note had been paid. To prove such payment, among other wit-

nesses, the defendants called John Frost, who testified *that*, in the spring of 1846, after the ice broke up in the Kennebec river, he, at the request of Steward, (then being connected with him in the business of sawing lumber,) called at the Franklin Bank, for the purpose of ascertaining whether said note had been paid, and inquired of Hiram Stevens, the cashier, in the banking room, if the note aforesaid, on which said Steward was surety, had been paid; to which question said Stevens replied that it had been; *that* he, the witness, then left the bank, no further inquiry being made, and communicated said answer to Steward; *that* Steward and himself had then lumber in their possession belonging to Dinsmore, which they had sawed for him, with which Steward might have secured himself by attaching it; *that* they had a lien upon it for the sawing and stumpage; *that* they detained said lumber several days, until the witness was informed upon said inquiry, that said note had been paid; *that* they then gave up the lumber, on payment of the lien; *that* Dinsmore failed in business in June or July, 1846, and has ever since continued insolvent, and is now worthless.

The plaintiffs, among other evidence, to show that said note was not paid, examined Joseph Eaton, Esq., who had been first called as a witness by the defendants, and who was one of the trustees chosen by the stockholders of said bank, who testified *that* said note was, in December, 1848, turned out to said trustees as an unpaid note, and as part of the assets of the bank, by said Stevens, as cashier; *that* said Stevens died in September, 1849; *that* there was no entry on the books of said bank of any payment of said note; *that*, on the contrary, there appeared from the said books to be a balance of upwards of $200 against said Dinsmore.

It was proved that said Steward and Webber had resided in Gardiner since said note was given, and were then, and have continued to the present time to be men of property.

The evidence of said Frost to the declaration of said Stevens was objected to by the counsel for plaintiffs, but the objection was overruled.

The Judge instructed the jury, *that,* if they believed the testimony of Frost, and that Stevens, when employed by the plaintiffs, as cashier, actually declared said note to be paid, upon the inquiry of said Frost of him, at the request of Steward, whether it had been paid, they were authorized from that evidence to infer payment of said note: also *that,* if they believed that said Stevens, when so inquired of by Frost, told him said note had been paid, and said Frost communicated that information to the sureties, and they acted and relied upon that information, and lost the opportunity of securing themselves out of the property of said Dinsmore in consequence of said information, the said sureties should thereby be discharged, whether said note had actually been paid or not; and *that,* if either of the defendants *was* entitled to a verdict, the verdict must be for all the defendants, for it must be against all or none.

If said testimony of Frost was legally admissible, and if said instructions to the jury were correct, the verdict, which was for the defendants, is to stand; otherwise, the same is to be set aside, and a new trial granted.

*Allen,* for the plaintiffs.

*L. M. Morrill,* for the defendants.

SHEPLEY, C. J. — The question presented is, whether a declaration of the cashier of the bank, that the note had been paid, was properly admitted as evidence.

The powers and duties of the officers of corporations are usually determined by their charters and by-laws, and by the laws of the State. Many of the powers and duties of the officers of banks are so determined in this State. Their general management is committed to a board of directors, who are the general agents of their respective banks, and who appoint their cashiers. The laws of the State require the cashiers to perform certain duties, and that each should give a bond with sureties for the faithful performance of his duties. The laws regard them therefore, as having certain official duties to perform. They may become the agents

of their respective banks for the performance of other duties. If they assume such duties, the extent and limit of their powers should be exhibited by proof of the acts which they have been held out to the public as accustomed to perform. When a bank presents its cashier as habitually performing certain acts or duties, these may be regarded as official acts or duties, and for the performance of them, he may be considered as its general agent. He cannot be regarded as a general agent for the transaction of all the business of the bank. The directors alone are authorized by law to make discounts; and they alone can make contracts binding upon it. A cashier, it is well known, is allowed to present himself to the public as habitually accustomed to make payment for its bills or notes payable to other persons. To make payment for bills and notes discounted by the directors. To receive payment for bills of exchange, notes and other debts, due to the bank. To receive money on deposit, and to pay the same to the order of the depositors. He is presented as having the custody of its books, bills, bills of exchange, notes and other evidences of debt due to it, and indeed of all its movable property. As making entries in its books, and as keeping its accounts and a record of its proceedings.

In many banks these duties are performed in part by tellers, clerks or other assistants, but generally, it is believed, under his superintendance, and he might at any time assume the performance of them, and perform them, if able to do so, without such assistance.

. His true position appears to be, that of a general agent for the performance of his official and accustomed duties. While acting within the scope of this authority he would bind the bank, although he might violate his private instructions. *Hatch* v. *Taylor*, 10 N. H. 538; *Planters' Bank* v. *Cameron*, 3 Sm. & Mar. 609.

Is it the duty of a cashier to give information respecting the past transactions of the bank to those dealing with it? If so, it must in this case be regarded as a part of his offi-

Franklin Bank *v.* Steward.

cial duty, for there is no evidence, that he had been held out by the bank as accustomed to give such information. If a suit were commenced on the bond, securing a faithful performance of his official duties, and the only breach assigned, was that of giving false information respecting a past transaction of the bank, no judgment, it is believed, could be rendered against him and his sureties, upon pleadings putting that matter only in issue. Neither the cashier nor his sureties undertake, that he shall retain in his memory past occurrences and transactions, to which he was at the time a party. The most assumed by them is, that he shall keep a correct account of them, for exhibition, upon the books of the bank. The books, papers and documents of the bank ordinarily are, and are designed to be, the true exponents of its past transactions. Upon these alone would a bank, or any intelligent dealer with it, consent to rely for information respecting such transactions with testimony upon oath, if need be, respecting the facts.

If the question were presented to the deliberate consideration of any well managed bank, whether it would consent to make its cashier its official agent to communicate information respecting its past transactions, can there be any doubt, that it would refuse to do so; and that it would choose to refer to its records, books, paper and other documents as the proper source of information? If the question were put to a cashier and his sureties so varied as to inquire, whether they would regard it as the official duty of the cashier to give such information, can there be a doubt, that it would be answered in the negative? If so, this would show, that it could not have been the intention of the bank or of its cashier, that it should be within the scope of his official duties.

It may be said, that the cashier is the only person, from whom a dealer with the bank can obtain such information.

He may be the agent to communicate such information, as it is the duty of a bank to give respecting past transactions to those dealing with it. But is a bank obliged to

communicate any such information further, than it is to be ascertained from its records, books, paper and documents? It cannot be regarded as assuming responsibilities or duties in this respect greater than those imposed upon individuals.

Persons may, and they often do, communicate information respecting their past transactions with others. This may be both useful and desirable for the correct and convenient transaction of business; but this does not prove, that a person is under any legal or moral obligation to do so. No suit could be maintained for a refusal to do it. The facts might not be sufficiently fresh in his recollection to enable him to do it. Or his present business might be too important and pressing to allow him to enter upon a history of past transactions. Such communications are matters of courtesy and of convenience, not of right.

Being no more matters of duty or of right on the part of a bank than on the part of an individual, its cashier cannot be considered its official or authorized agent to make them, unless they constitute a part of some transaction performed at the time of making them.

There may not be an entire conformity in the decided cases to rules believed to be well established for the reception or exclusion of the declarations, representations or admissions of agents; while an examination of them will exhibit but few cases opposed to rules generally approved.

The declarations, representations or admissions of an agent authorized to make a contract made as inducements to or while making the contract, are admissible as evidence against his principal.

They are also admissible as evidence against him, when made by his agent accompanying the performance of any act done for him.

They are not admissible and do not bind the principal, when not made as before stated, but at a subsequent time.

While it is generally stated in the decided cases, that the subsequent admissions of an agent, of what he had previously done, are not admissible as evidence against his prin-

cipal, there are cases, in which a conversation after the business appears to have been completed was held to be admissible. In the case of *Mortimer* v. *McCallan,* 6 Mee. & Wels. 58, Lord ABINGER says, " As a general principle it is undoubtedly true, that conversations with an agent after the transaction, are not evidence against his principal; but the question is whether this be not part of the *res gestæ.*" After some further remarks he observes, " it is a conversation between an agent and principal after the transaction is concluded, but a conversation at the time he is dealing with him and a part of the *res gestæ.*"

In the case of the *Bank of Monroe* v. *Field,* 2 Hill, 445, the admissions of the president of the bank were received respecting the payment of a note, but they were made upon an examination of its books and were therefore regarded as a part of the *res gestæ.*

There are a few cases to be found in which the declarations of an agent made after the transaction had been completed appear to have been received as evidence against his principal; but they are at variance with the well established and generally received rule in England and in this country.

The principles upon which the declarations of an agent can be received as evidence against his principal were so correctly stated by that accomplished jurist, Sir WM. GRANT, in the case of *Fairlie* v. *Hastings,* 10 Ves. 123, as to command general approbation. In that opinion he said : " As a general proposition what one man says, not upon oath, cannot be evidence against another man."

" What the agent has said may be what constitutes the agreement of the principal; or the representations or statements may be the foundation of or the inducement to the agreement. Therefore, if writing is not necessary by law, evidence must be admitted to prove the agent did make that statement or representation. So in regard to acts done, the words with which those acts are accompanied frequently tend to determine their quality. The party therefore to be bound by the act must be affected by the words. But except

in one or the other of those ways I do not know how what is said by an agent can be evidence against his principal. The mere assertion of a fact cannot amount to proof of it; though it may have some relation to the business, in which the person making that assertion was employed as agent."

It is worthy of notice that these principles are not stated to be applicable to the declarations of special agents only but to all descriptions of agents. That they necessarily exclude the declarations of all agents not made at the time and not constituting a part of some transaction. And they appear to have been uniformly so regarded. *Langhorn* v. *Allnutt*, 4 Taun. 511; *Betham* v. *Benson*, 1 Gow. 45; *Garth* v. *Howard*, 8 Bing. 451; *Mortimer* v. *McCallan*, 6 Mee. & Wels. 58.

The same principles are recognized and the same rules prevail in the Courts of the United States. *United States* v. *Gooding*, 12 Wheat. 469; *American Fur Company* v. *United States*, 2 Peters, 364; *Barclay* v. *Howell*, 6 Peters, 498; *Westcott* v. *Bradford*, 3 Wash. C. C. R. 500; *Maury* v. *Tallmadge*, 2 McLean, 157.

Mr. Justice WASHINGTON, stated the rule very concisely and clearly in the case of the *American Fur Company* v. *The United States*, "whatever an agent does or says in reference to the business in which he is at the time employed and within the scope of his authority is done and said by the principal."

The same principles and rules appear to have been received as the established law in many States of the Union. *Woods* v. *Clark*, 24 Pick. 35; *Haynes* v. *Rutter*, Id. 242; *Stiles* v. *Western R. R. Corporation*, 8 Metc. 44; *Corben* v. *Adams*, 6 Cush. 93; *The Fairfield County Turnpike Corporation* v. *Thorp*, 13 Conn. 173; *Thallhimer* v. *Brinckerhoff*, 4 Wend. 394; *Rossiter* v. *Rossiter*, 8 Wend. 494; *The Bank of Monroe* v. *Field*, 2 Hill, 445; *Hannay* v. *Stewart*, 6 Watts, 489; *Stewartson* v. *Watts*, 8 Watts, 392; *City Bank of Baltimore* v. *Bateman*, 7 Har. & John. 104; *Franklin Bank* v. *Steam Navigation Co.*, 11 Gill. &

John. 28; *Strawbridge* v. *Spawn*, 8 Ala. 820; *Tomlinson* v. *Collett*, 3 Blackf. 436; *Waterman* v. *Peet*, 11 Illinois, 648.

A different or more extended rule cannot be received in this State, without overruling decided cases. *Haven* v. *Brown*, 7 Greenl. 421; *Gooch* v. *Bryant*, 13 Maine, 386; *Maine Bank* v. *Smith*, 18 Maine, 99.

It is but a perversion of language to say, that a declaration made when no act is performed, and having reference only to a past transaction, is a part of the *res gestæ.* To do this would be destructive of the rule, by abolishing all distinction between declarations made at the time, and constituting part of a transaction and those made subsequently and having no connexion with it.

With respect to the propriety of any attempt to extend or vary the rule, or to restrict it to special agents, the remarks of TINDALL, C. J., made in the case of *Garth* v. *Howard*, are peculiarly appropriate. "It is dangerous, (he says,) to open the door to declarations of agents beyond what the cases have already done. The declaration itself is evidence against the principal not given upon oath; it is made in his absence when he has no opportunity to set it aside, if incorrectly made, by any observation or any question put to the agent; and it is brought before the court and jury frequently after a long interval of time. It is liable therefore to suspicion originally from carelessness or misapprehension in the original hearer; and again to further suspicion from the faithlessness of memory in the reporter and the facility with which he may give an untrue account. Evidence therefore of such a nature ought always to be kept within the strictest limits, to which the cases have confined it."

In the present case one of the sureties sent a messenger to the bank sometime after the note had become payable, to inquire whether it had been paid. Upon inquiry of the cashier then in the discharge of his duties in the bank, he received for answer that it had been. This was communi-

cated to one of the sureties who thereupon surrendered property of the principal in his hands, from which he might have obtained payment. This he was under no obligation to do without a production of the note or other satisfactory evidence of payment. The messenger does not appear to have communicated to the cashier that he was requested by any party to the note to make the inquiry, and the cashier might have concluded that it was an impertinent attempt to pry into the private concerns of a debtor. It does not appear that any inquiry was made whether the note had been delivered to the maker. It in fact remained uncanceled in the bank. Or that the cashier made any examination of the books of the bank or of its notes to ascertain whether payment had been made, or that he was requested to do so.

The declarations of the cashier made under such circumstances cannot be regarded as legally admissible evidence against the bank. Nor can the instructions to the jury respecting the effect of that testimony be regarded as correct.                                *Verdict set aside and*

*new trial granted.*

TENNEY and HOWARD, J. J., concurred.

RICE and APPLETON, J. J., dissented.

RICE, J. — Were the declarations of Hiram Stevens, the cashier, that the note in suit had been paid, competent evidence for the defendant? To determine this point the relations which existed between Stevens and the bank, the character of the declaration relied upon, and the time and the circumstances under which those declarations were made, must be considered.

The statement or representation of an agent in making an agreement, or in doing any act within the scope of his authority, is evidence against the principal himself and equivalent to his own acknowledgment. 1 Phil. Ev. 99. The rule admitting the declaration of the agent, is founded upon the legal identity of the agent and principal; and

therefore they bind only so far as there is authority to make them. Where this authority is derived by implication from authority to do a certain act, the declaration of the agent, to be admissible, must be part of the *res gestæ.* 1 Greenl. Ev. § 114.

The cashier of a bank is its agent, and as such entrusted with very large powers. He is usually entrusted with the funds of the bank, in cash, notes, bills and other choses in action, to be used from time to time in the ordinary and extraordinary exigencies of the bank. He receives directly, or through subordinate officers, all moneys and notes of the bank. He delivers up all discounted notes, and other property where payments have been made; and draws checks from time to time for money wherever the bank has deposits. In short, he is considered the executive officer through whom and by whom the whole moneyed operations of the bank, in paying or receiving debts, or discharging or transferring securities are to be conducted. Story on Agen. § 114; Angell & Ames on Corp. 244.

Again, we are told that the cashier of the bank is, *virtute officii,* generally entrusted with the notes, securities and funds of the bank, and is held out to the world by the bank as its general agent in the negotiation, management and disposal of them. Angell & Ames on Corp. 245.

Such being the scope of the authority of the cashier as general agent of the bank, the authority of Stevens to receive payment of the note in suit, and to discharge the parties thereto, will not be contested. Nor is it denied that declarations made by him at the time of the payment, and explanatory of that act, might, with propriety be given in evidence by the defendant. But it is contended, that his declarations, to be admissible, must have been made at the very time of payment, and have constituted a part of that transaction; and that declarations made by him subsequently, though with reference to the same subject matter, to a party interested, while his agency continued, and when he was acting in the business of that agency, are inadmissible.

The general rule under which the declarations and admissions of agents to affect the rights of principals, seems to be universally recognized in courts of justice.

In the application of the rule to particular cases there has not been entire uniformity of practice. In very many instances, by Courts and text writers of high authority, the application of this rule has been restricted to those declarations made by the agent at the very time the act was done, to which they referred.

Thus in the case of *Barclay & als.* v. *Howell's lessees*, 6 Pet. S. C. R. 498, it is said that the declarations of an agent with respect to a thing done within the scope of his authority, are not evidence to charge his principal, unless they were made at the time the act was done, and formed a part of the transaction.

In *Magill* v. *Kauffman*, 4 S. & R. 317, the Court say the agent is authorized to *act*, therefore his acts explained by his declarations, *during the time of action*, are obligatory on his principal; but he has no authority to make confessions after he has acted, and therefore his principal is not bound by such confessions.

In *Corbin* v. *Adams*, 6 Cush. 93, in which the declarations of a son, who had made a contract for his own services as the agent of his father, as to the terms of that contract, were offered in evidence. Mr. Justice WILDE says — " the rule of evidence is laid down in the case of *Stiles* v. *Western Railroad*, 8 Met.. 44. When an agent is acting within the scope of his authority, his declarations accompanying his acts, are admissible, as they may qualify his acts ; but his declarations as to other matters and transactions are merely hearsay testimony."

It should be remarked, however, that in the case of *Stiles* v. *the Railroad*, cited above, the declarations offered referred to matters not within the scope of the agent's authority, and the Court, in their opinion, so declare, and for *that* reason they were rejected.

The representation, declaration or admission of an agent,

·docs not bind the principal, if it is not made at the very time of the contract; or if it does not concern the subject matter of the contract, but some other matter, in no degree belonging to the *res gestæ.* Story on Ag. § 135.

These cases are cited as illustrating the doctrines with which the rule in relation to the declarations of agents has been applied by courts and elementary writers whose opinions are entitled to great consideration.

But whether too great a degree of strictness has not sometimes been observed in this class of cases may well admit of doubt.

A manifest distinction exists touching the admissions and declarations of special agents with authority to perform certain specified acts, and those of general agents who are entrusted with the supervision and control of a particular ·or general business. The former having authority delegated to do a certain specified act, when that act is done, all privity of interest between the principal and agent ceases. They become strangers to each other. In the latter the privity continues in relation to all acts performed by the agent, within the scope of his authority, until the agency, itself, is terminated.

Hence, in the former case, it may with propriety be held, that only such declarations as are made at the time the particular act is done, by the agent, shall be admitted, while in the latter, explanatory declarations, made subsequently to the transaction, but while the agency continued, have been admitted as being within the scope of the agent's authority, or as part of the *res gestæ.*

The case of *Fairlie* v. *Hastings,* 10 Vesey, 122, is often cited as a leading case, establishing the strict doctrine contended for by the plaintiffs in the case at bar. An examination of that case will, however, show that it is not authority to the extent usually claimed for it. The Master of the Rolls, in that case did state certain general propositions, in relation to this kind of evidence, broad enough, perhaps, to cover the principles contended for. These statements were,

however, *mere dicta.* The declarations were excluded in that case, because they came from a party who was not in fact proved to be the agent of the defendant. The acts sought to be established by the declarations of the supposed agent, were performed by the defendant himself. And in view of this state of things the learned Judge very justly remarks; "a man cannot admit what another has done, or agreed to do; but he must prove it."

In the case of *Garth* v. *Howard & al.*, 8 Bing. 451, which was *detinue* for certain plate of plaintiff, pawned without his authority to the defendant, a pawn-broker; the only evidence to show that the plate had ever been in defendant's possession was, proof of the declarations of his shopman, that it "was a hard case, for his master had advanced all the money on the plate, at five per cent." TINDALL, C. J., in giving the opinion of the Court, said:—"If the transaction out of which this suit arises had been one in the ordinary trade or business of the defendant as a pawnbrok-er, in which trade the shopman was agent or servant to the defendant, a declaration of such agent that his master had received the goods might probably have been evidence against the master, as it might be held within the scope of such agent's authority to give an answer to such an inquiry made by a person interested in the goods deposited with the pawnbroker. In this case, the rule laid down in *Fairlie* v. *Hastings*, 10 Vesey, which may be regarded a leading case, as evidence on this head, directly applies;" showing clearly that this able jurist did not understand the rule to be that the declarations of a general agent were re-stricted to those made at the time of the transaction, and further, that he did not understand that such a rule was laid down in the case of *Fairlie* v. *Hastings.* "But," continues the Judge, "the transaction with the defendant, is not a transaction in his business as a pawnbroker." The evidence was excluded on that ground.

PRATT, C. J., 1st Stra. 527, allowed the declaration of a

wife as to what she had agreed to pay for nursing a child as good evidence to charge the husband.

In *Hughes, adm'r,* v. *Stokes, adm'r,* 1 Hay. 372, which was assumpsit for board and lodging; on the part of the defendant, it was offered in evidence that Mrs. Hughes had acknowledged the accounts to have been discharged, or nearly so. This evidence was objected to; but the Court say " the wife, in the present case, acted as the agent or servant of the husband, and received his moneys. The business was carried on by her, and her declarations should be admitted to discharge Stokes."

In *Emerson* v. *Blanding,* 1 Esp. 142, Lord KENYON stated the rule of law to be, that when the wife acts for her husband, in any business by his consent, he thereby adopts her acts and must be bound by any admissions or acknowledgments made by her respecting the business.

In the case of *Welsh* v. *Carter,* 1 Wend. 185, which was assumpsit on a promissory note given for a quantity of barrilla, sold by one Fitch as agent, and represented by him as of a good quality, but which turned out to be worthless; the defendant offered to prove declarations and representations made by Fitch to sundry persons, subsequent to the sale to the defendant, relative to the value and quality of that portion of the article which remained on hand. This testimony was objected to but admitted.

SUNDERLAND, J., in giving the opinion of the Court, said, " The declarations or representations of Fitch in relation to this same lot of barrilla, to other persons, to whom he offered parcels of it for sale, subsequent to the sale to the defendant, I am inclined to think were properly admitted. Fitch was the agent for the plaintiff for the purpose of selling the whole lot of barrilla, and his agency continued until that was accomplished, or his power was withdrawn."

In the case of *McCormick* v. *Barnum,* 10 Wend. 104, one Baker had been employed as a surveyor to lay out the north half of a township into lots. It was proved on the trial that immediately thereafter, Baker, (who was dead at

the time of the trial,) said " he and Wood had been to examine the division line near Copely ; that they had found it to be as near right as two different surveyors would be likely to get it ; that they had found it to be correct, and allotted the north half accordingly ; and that they had made a field book and map of the survey, reported their proceedings to an agent of Harrison, and received payment for their services." Proof of these declarations was objected to, but the evidence was received, and the full Court, SAVAGE, C. J., delivering the opinion, held they were properly received, as being declarations within the scope of his authority as agent.

In *Curtis* v. *Ingraham*, 2 Vermont, 287, the declarations of the wife, who was proved to be the agent of the husband, " that she had got rid of the demand (in suit) and she was glad of it ; that she had sold it to her son-in-law, Farnham, who was carrying on the suit," were admitted as competent evidence for the defendant, who claimed to have settled the demand with Farnham.

The Court in their opinion say, " her sayings must not be considered merely as acknowledgments of previously existing facts, but also as declaratory of the actual situation of Farnham, and the confidence that might be placed in him by the defendant."

The admissions of an agent are binding upon his principal if made within the scope and during the existence of his agency ; but after his agency ceases, his admissions or statements are not binding. *Levy* v. *Mitchell*, 1 Eng. 138.

In the case of the *Bank of Monroe* v. *Field*, 2 Hill, 445, the declaration of the president of the bank, that a note had been paid, made after an examination of the book, was admitted as proper evidence for the defendant as being part of the *res gestœ*, on the ground, that the president was a principal officer of the bank, and this being within the scope of his authority.

In the case of *State Bank* v. *Wilson & al.*, 1 Dev. N. C. R. 485, which was an action against the defendants as sure-

ties on a note, it was proved at the trial, that the cashier, (who had died insolvent,) on being applied to by an agent of the defendants, to learn the situation of the debt, replied, "that the indorsers were discharged, the debt having been paid by himself, and the whole business settled." The full Court, on advisement, held, that this testimony was properly admitted. There was no entry on the books of the bank showing that the note had been paid.

It will be found difficult, perhaps impracticable, to reconcile all the adjudicated cases, with any general rule, by which this kind of evidence is admitted or excluded.

The distinction between subsequent declarations made by special agents, with powers limited to the performance of particular acts only, and the explanations of general agents, having under their control a general business, made with reference to their own acts within the scope of their authority, and during the continuation of their agency, does not seem at all times to have been kept in view.

The reason for adopting the more extended rule, applicable to general agents, would seem to apply with peculiar force in the case at bar. The plaintiff is a banking corporation, an institution having numerous and important business transactions with the public. The general direction of its affairs is, it is true, under the supervision of a board of directors. But this board has little direct communication with the public. The cashier is the officer with whom the customers of the bank transact a very large proportion of their business. He has the custody of all the notes, bills and other securities belonging to the bank. To him all payments are made, and by him all securities are surrendered, when paid. As those securities are under his exclusive control, their condition must be, necessarily, within his personal knowledge, and his answers to inquiries made by persons interested, while in the discharge of his ordinary official duties, as to the conditions of such securities, are, in my opinion, acts clearly within the scope of his authority. To hold otherwise, would be to exceed the popular theory,

that such institutions are destitute of an important vital element possessed by natural persons, and to determine that they are also, practically, without any responsible organ of communication with the world.

It is contended, that the books of the bank, its records of the acts of its directors, are the legitimate and proper evidence of its contracts and proceedings, and that the declarations of its officers can only be given in evidence, if at all, in relation to past transactions, when made in connexion with an examination of the books, thus being made a part of the transaction or *res gestæ*.

The books are the private property of the bank over which its customers have no control; and besides, the records of the proceedings of the directors would not show what notes had, or had not been paid, even if they were accessible. But the question is not what could be shown by the records if they were introduced as evidence, but whether the act of examining them changes the character of the declarations of the agent, in relation to past transactions, performed by the agent. Suppose the cashier in this case had examined the books on which the acts of the directors were recorded, or any memoranda made by himself at the time of the payment of the note, before making his declarations. Such examination would have constituted no part of the *res gestæ* of payment. At most it could only serve to refresh his recollection of a past transaction, and would be wholly useless, if his recollection was distinct without the reference. In one case he would state a fact within his own knowledge, from recollection; in the other he would state the same fact with his recollection refreshed by an examination of the books or memoranda. The principle of evidence would be the same in both cases.

It is undoubtedly true that the bank is under no legal, and possibly no moral obligation to give information to its customers as to the condition of its securites or as to their liability on paper which the bank has discounted. Nor is an individual obliged to give information in relation to his

business transactions, past or present. In both cases the giving of such information may be a mere act of curtesy. Yet although a suit at law might not lie against an individual who should be so discourteous as to give false information, still his admissions or declarations would be competent evidence against him in an action where they were pertinent to the issue, and it is not perceived why the same rule should not apply to a bank.

Onerous indeed is the situation of the customers of banks, if they can only obtain responsible information touching their liability upon notes in the custody of cashiers, by calling a meeting of directors, to answer a simple inquiry relating to transactions peculiarly within the knowledge of their cashiers, by a formal, official resolution of the board.

From these considerations, I am of the opinion, that both upon principle and authority, the declarations of the cashier were properly admitted. The degree of credit they were entitled to should be determined by the circumstances under which they were made.

The next instruction to which objection is taken is so intimately connected with the one which has already been considered, as necessarily to stand or fall with it. I think it was correct. *State Bank* v. *Wilson,* 1 Dev. 485.

APPLETON, J. — If a surety having security for his liability should surrender the same, or, if having an opportunity to obtain indemnity, he should omit obtaining it in consequence of receiving information from the creditor, that the debt for which he was liable, is paid, he is discharged from such liability, though the creditor was in mistake, the debt not having been paid. *Baker* v. *Briggs,* 8 Pick. 123; *Waters* v. *Creugh,* 4 Shu. & Per. 410.

Corporations and individuals are alike subject to the general rules of law. The facts which would discharge a surety, where the creditor is an individual, should have the same effect where that relation is sustained by a corporation.

Individuals can act personally or by the intervention of agents. The action of corporations is by a vote of the corporate body and by their duly appointed agents.

The duties of a cashier are well defined and clearly understood. He is the principal agent of the bank, through whom communications relating to its business transactions are made. The notes or bills deposited with, or discounted by the bank are in his custody and under his control. All payments are made to him, and when notes or bills are paid he delivers the same to the party by whom such payments are made.

If notes or bills, whether deposited or discounted, are not paid at maturity, it is his duty to notify the indorsers or cause them to be notified, and if he neglects this duty, the bank is liable for his omission.

The indorser or surety is bound to perform the contract of his principal, when notified of his failure. If bound to pay, he must have a right to know at any time, the then present condition of his liability. The note or bill, though not paid at maturity, may since have been paid in whole or in part. The bank may have taken collateral security and upon payment by an indorser, he is entitled to all the rights of subrogation. Whether there is collateral security or not, he is entitled to the possession of the note or bill when paid by him as evidence of his rights against his principal, or against those who may have preceded him as indorsers.

The indorser or surety may well claim to know at any time the then present condition and extent of his liability; to ascertain his rights and duties, so that he may be in a condition to claim the one and perform the other. The cashier is the individual, who has the rightful custody of the paper discounted, and to whom payment is to be made. The books of the bank show what has been discounted and what payments have been made, and are under his control. The cashier is therefore the officer of the bank, to whom application is to be made by a party interested, to ascertain at any time the then condition of his liability.

In giving the desired information, the cashier, when called upon for that purpose at the bank, may give his recollection or he may examine particularly, the books of the bank, and state the result of such examination. It is for him to determine the degree of attention he will bestow upon the subject matter before him. Whether the information given is the result of a more or less careful examination, whether it be verbal or in writing, the same rule as to its admissibility must apply. If his official certificate would be evidence, his declarations at the bank during banking hours to one interested and having a right to inquire must be equally admissible. If injurious consequences result from negligence, falsehood or fraud in the communications made, and a loss follows therefrom, it should be borne rather by the bank than by one whose only fault it is, that he relied upon the statements of its accredited agent.

The inquiry in this case was made of the cashier at his regular place of business during banking hours, and while he was in the exercise of his official duties. It was made by one having an interest in the inquiry, or by his agent. It was made of the cashier as an officer of the bank, and because he was such officer. The information given by him was given while in the transaction of his official business, and not by him as an individual. I cannot regard this other than the acts of an agent in and about the business of his agency, and within the scope of his official duty. It is the ascertainment of the present relation of a supposed surety to the bank, whether a liability formerly existing still remains. It is not a statement of the past, but a present transaction relating to the proper business of the bank. If then the cashier is to be regarded as acting officially in giving information to a surety rightfully inquiring of him at the bank of the then present condition of his liability, the same consequences should result against the bank from this information, if erroneous, as would result in case the cashier had been the owner, against him.

If the surety with the money of his principal should pay

the note or draft upon which he is liable at the bank, and in banking hours, it would not be questioned that the cashier in receiving it, was acting in the discharge of his duty as such officer. If the surety with the money of his principal should, at the same time and place, offer to pay such money and should receive the information of such cashier that the note had been paid and surrendered to the principal, he would be equally acting officially as if he received the money and applied it to the discharge of the note or draft upon which the person paying it was liable. If in such case, acting upon the information thus received, the surety should surrender his security to his principal, it will hardly be contended that another and different rule should exist where the claim is held by a corporation, than would obtain if the cashier had been the owner and had made the same statements. So if the surety, having ample indemnity for his protection, should apply to ascertain whether it will be required or not, and should be told that the note or bill was paid, and in consequence thereof should give up to his principal the property which he would otherwise have appropriated to its payment; is it easy to perceive why the bank should be exempted from the operation of those rules of law which in a similar case would have discharged such surety had the note belonged to the cashier?

Neither the declarations of the holder of the note, when he is an individual, nor those of an agent, when, as in this case, his principal is a corporation, are conclusive. If the information thus given is erroneous, and no injury should result from it, or if the error should be seasonably corrected; the bank should not suffer. The principle upon which the surety is relieved, is that his condition has been injuriously affected by the wrongful or negligent acts of the bank or its agent. If no such injury has arisen, then the grounds upon which the surety rests his claim for exoneration from liability, no longer exist.

The cashier is not bound to answer impertinent inquiries, or to satisfy idle curiosity. The surety may apply person-

ally or by agent. If any question as to the authority of the agent to make the inquiries should arise, the cashier may withhold the information until he shall be reasonably satisfied they are made at the instance and in behalf of the party interested.

Whether the bond of the cashier would, in this and similar instances, protect the bank from the consequences of his neglect, must be determined by the language the parties may have used in drafting it. It may or it may not. Whether the action of the cashier in a particular case, was or was not within the scope of his authority, depends upon the extent and limits of his agency, rather than upon the peculiar form of indemnity which he may have given his principal.

The bank is bound to know the character of its officers. It holds them out as entitled to confidence. If they are negligent, unfaithful or dishonest, it should suffer the consequences of such negligence, unfaithfulness or dishonesty. Any other result would relieve the bank from the effects of the misconduct of its agents and impose them upon strangers, who have no choice in their selection nor control over their action.

The questions involved in the decision of this case are of no slight importance. For this cause, I have deemed it expedient briefly to state the reasons which have induced me to dissent from the conclusions to which the majority of the Court have arrived.